The State of Iowa v. Wooderd.

## The State of Iowa v. Wooderd.

1. **Criminal law:** FORGERY: RECEIPT. An alteration of a genuine receipt, by the parties holding the same, in such manner as to make it show that the moneys receipted for were to be applied in payment of the note of a third party, if done with a fraudulent intent, is forgery.

    *Argu.* 1. The making or alteration of *any writing*, with a fraudulent intent, whereby another *may* be prejudiced, is forgery ; it is not essential that any person should be actually injured.

The State of Iowa v. Woodcrd.

—— It is sufficient if the instrument be genuine, that it would be the founda-
tion or the evidence of another's liability.

—— A material alteration of a genuine instrument whereby a new operation
would be given to it would be a forgery of the whole.

2. **Evidence:** BOOKS OF DECEASED PERSON. Entries made by a party who
is dead, in relation to his own business transactions, in a book kept for
that purpose, are admissible in evidence as to such transactions, when
clearly against the interest of the party making the same.

—— Whether it should also be made to appear that the entries were
"made at or near the time of the transactions, *query ?* "

3. —— INSTRUCTION AS TO WEIGHT. The jury should be told that while
this testimony is competent, the right of cross-examination does not
exist, that it is not highly favored by the law, and that they should give
it such weight, as, under all the circumstances, they deem it entitled to.

4. —— FORGERY: COMPETENCY. The competency of evidence offered and
refused on the trial of an indictment for forgery, considered and deter-
mined.

5. —— IMPEACHING EVIDENCE. It is improper to ask a witness on cross-
examination, if, on the trial of another cause, he was not successfully
impeached.

6. **Criminal law:** FORGERY. The criminal intent which the law infers
from forging an instrument, and using it as evidence of a claim against
the party whose name is forged, cannot be negatived by evidence show-
ing that the claim was in reality a just one.

*Appeal from Des Moines District Court.*

TUESDAY, JUNE 19.

FORGERY: WHAT ESSENTIAL TO THE CRIME: ENTRIES
IN BOOKS OF DECEASED PERSONS AS EVIDENCE: INTENT TO
DEFRAUD: PROOF OF, &C. —— The defendant was indicted for
fraudulently altering two receipts. With the alleged alter-
ations, the receipts are of the tenor following:

"Received, February 28, 1863, of W. Woodward, four
hundred dollars, to be applied to the payment of J. Long's
notes.

$400.                     ROBERT ARMSTRONG."

"Received, April 16, 1863, of Mr. W. Wooderd, two hundred dollars, on account of interest and principal of notes on J. Long.

$200.        ROBERT ARMSTRONG."

On the trial, the theory of the State was that Armstrong had executed these receipts to Wooderd to evidence payments which Wooderd had made on *his* (Wooderd's) *own* indebtedness to Armstrong; and the alleged *alteration* consisted in changing the *dates* of the receipts and inserting the words "*J. Long*," so as to make the receipts apply to notes which "*Long*" owed to Armstrong.

The State claimed that the $400 receipt, before it was altered, bore date February 26, 1862; that it was altered by the defendant so as to bear date February 28, 1863; that it read, before it was altered, "to be applied to the payment of *his* notes;" that it was altered by the defendant so as to apply to the *Long* notes.

The State also claimed that the $200 receipt above copied, was originally dated April 11th, 1861; that it was fraudulently altered to April 16, 1863; and was further altered by the insertion of the words "on J. Long."

The dates are important to be borne in mind. It is essential to state some further particulars concerning the respective indebtedness of Long and the defendant to Armstrong.

On the 17th of April, 1860, Wooderd executed to Robert Armstrong notes as follows: $200 due June 1, 1860; $363.66 due April 17, 1861; $363.66 due April 17, 1862; $363.66 due April 17, 1863.

These notes were secured by a deed of trust on 100 acres of Wooderd's land. February 7, 1863, Armstrong entered upon the record in the recorder's office, this indorsement: "This deed of trust and notes are paid in full, &c. ROBERT ARMSTRONG."

In the above notes and deed of trust, Long in no way ever had any individual interest. The facts respecting Long's indebtedness to Armstrong may be condensed thus: On the 21st day of May, 1860, Long executed a note to one D. McAllister at 1 year for $319, and, on same day, a note to one D. Black for $81, making $400 in all, and secured the same by a deed of trust on three parcels of land. On the 13th day of July, 1861, Long and wife conveyed *two of these tracts to Wooderd by general warranty.* In May, 1862, Long executed a letter of attorney to Wooderd, empowering him *" to transact all of his (Long's) business."*

This was executed by Long in anticipation of a protracted absence in Montana, or some western territory, and Long soon after went west and remained absent until November, 1864.

The above notes from Long to McAllister and Black were indorsed by the payees thereof to, and became the *property of Armstrong*, if indeed they were not in fact always his.

The Long notes as produced on the trial showed indorsements of interest thereon at various times down to May 21st, 1862.

*Robert Armstrong died* July 22d, 1863; and the Long notes came into the possession of Armstrong's executor.

In August, 1863, the amount of the Long notes was advanced by one McCash (Long's brother-in-law), to Armstrong's executor, and the notes assigned to McCash. This was done at the instance of Long's wife.

The defendant being informed of this, showed McCash the receipts in question, and "claimed that they were to be paid on the Long notes." McCash does not state how the receipts then read.

Wooderd made the same claim to Gay (the active agent,

is settling the estate of Armstrong), and left the receipts with him.

Gay delivered this important testimony on the trial: "Wooderd came to me shortly after I was appointed agent of the estate. [Receipts shown witness.] The amounts are now the same as when Wooderd left them with me. But the dates are not the same, and the word "J. Long" was not then in them. I next saw the receipts in the county judge's office after I had handed them back to Wooderd."

Long, on the trial, denied, notwithstanding the general language of the letter of attorney, that Wooderd had any authority to pay the notes to Armstrong, and stated (against defendant's objection) that the particular object of the power of attorney was to enable Wooderd to prevent a road being laid out through his land in his absence.

Long also testified that Wooderd claimed that he had paid the notes to Armstrong, and wanted him (Long) to admit his (Wooderd's) authority to do so, as in that way Long could get up his notes, and McCash get his money back from the Armstrong estate. This Long refused to do.

After Long's return, viz., in February, 1864, the defendant filed with the county judge the following account:

"Estate of R. ARMSTRONG,
           In account with WM. WOODERD, Dr.
  1863.
Feb. 28. To cash received as payment on John
                 Long's note,.................... $400
Apr. 16.              ditto                         200
         Interest, ........................       31
                                                 _____
                                                 $631 "

On the hearing of this claim before the County Court, Wooderd produced the receipts alleged in the indictment

to have been altered, as evidence to support his right to recover.

The County Court disallowed the claim.

On the trial of the indictment the above facts appeared. There was also testimony by experts offered by the State to show that the receipts bore upon their face evidence of having been altered. The State was also allowed, against the defendant's objection, to introduce in evidence the "Note Register," kept by Armstrong in his lifetime.

The further facts respecting this are stated in the opinion.

The defendant introduced one Prettyman as a witness, who testified that on the last day of February (28th), or 1st day of March, 1863, he saw Wooderd pay Armstrong $400 on the John Long notes; and received a receipt which, as Armstrong read it, contained Long's name; that Wooderd assigned as a reason for paying this amount, that he had eighty acres of John Long's land, and wanted to pay off the mortgage on it. One Clark testified that about the middle of April, 1863 (i. e., about the date of the $200 receipt), he saw Wooderd pay Armstrong in a New York draft, $200, on the John Long notes.

The State offered testimony to impeach the witness Prettyman.

The defendant was convicted and sentenced to five years' imprisonment in the penitentiary.

Defendant appeals.

*F. E. Bissell*, Attorney-General, for the State.

*Charles Ben Darwin*, for the defendant.

DILLON, J. — The defendant's attorney makes the point that the whole case, take it in any view of it, does not

1. CRIMI- establish a crime. This objection, if well founded, NAL LAW: would dispose of the cause. It will, therefore, alteration of genuine receipt. be first examined. We state the defendant's argument on this point in the language of his attorney.

"Those paper receipts" (so the attorney argues) "gave defendant no legal claim against the estate of Armstrong. They could not as a legal fact be fruitful of any advantage, to defendant as regards the estate of Armstrong.

"The law will not presume an intent to defraud from an act which could not legally be the means of doing so. Long was the only man who could have used these papers to the disadvantage of the estate; but Long was neither a party to them, nor one having an intention to use them. They were no legal evidence of any claim of *defendant* against the estate. Nor could Long use them as such till delivery to him, which had not been made. Nor did they give defendant any right against Long if the payment was voluntary. The act charged was consequently no crime."

This argument overlooks the consideration of *injury* or *prejudice* to Armstrong and rests upon the idea that it is a defense, if the defendant could not legally and successfully reap a *personal* advantage from his wrongful act.

The making or alteration of *any writing* with a fraudulent intent, whereby another *may* be prejudiced, is *forgery*. It is not essential that any person should be actually injured.

It is sufficient that the instruments, if genuine, would be the foundation, or the evidence of another's liability. A material alteration in part of a genuine instrument, whereby a new operation is given to it, is a forgery of the whole. These propositions of law are undisputed. *Ward's Case*, Hil., 13 Geo. I; *Rex* v. *Ward*, 2 Str., 747; 2 Ld. Raym., 1461; 2 East P. C., 861; *Barnum* v. *The State*, 15 Ohio, 717; *Arnold* v. *Cost*, 3 Gill. and J., 220; 1 Hawk. P. C., ch. 70, sec. 2; *The State of Iowa* v. *Thompson*, 19 Iowa, 65; 2 Russ. on Cr., 361.

In view of these principles and the facts of this case, the defendant's positions are unsound. It is plain that the receipts in question, if genuine, would found a liability, or

be the evidence of a liability on the part of Armstrong. What liability? This: that he would have to apply the $600 mentioned in the receipts toward the payment of the long notes. If he had brought action on these notes, these receipts, supposing them genuine, would defeat it. Long could use them for this purpose, certainly, by adopting the act of Wooderd in making the payment. If Armstrong had brought his action to foreclose the Long deed of trust, making, as he properly might, Wooderd, as a subsequent purchaser, a party defendant, it cannot be doubted, that *Wooderd could himself* use the receipts, to defeat the action, at least, so far as respected his own land. It is plain, therefore, that Armstrong *might* be prejudiced by the alleged forgery, and this is all that the law requires. It is plain, also, that the receipts could be made "fruitful of an advantage to the defendant."

Again: Wooderd, according to the receipts, paid the money to Armstrong, the latter agreeing to apply it on the notes of Long, in the payment of which the defendant had, as a subsequent purchaser of a part of the land securing these notes, a direct interest. Now, if after this the notes are transferred without any indorsement of payment thereon, and the receipts are set up against the indorsee and defeat him, Armstrong would be liable to such indorsee for the amount received by him when he sold the notes (*Cheshire* v. *Watson*, 18 Iowa, 203); and in this way he might also be prejudiced. And it is more than probable that if the notes were transferred after payment, and the amount omitted to be indorsed, that Armstrong might be made liable to the party who paid the money to an action for money had and received or on the case.

In other words, the party paying might not alone be confined to setting up the payment in defense to the notes.

The State of Iowa v. Wooderd.

This point, however, is not necessary to be decided. See *Watson* v. *Cheshire, supra,* and authorities cited.

In considering this objection we have viewed the case as the State would have a right to insist upon it to the jury, and thus viewing it we have, we think, demonstrated that the " alteration of the receipts in the manner alleged by the State would be a crime."

On the State's theory, the defendant had obtained credit on his own notes for the payments mentioned in the receipts, and by altering them endeavored to get the benefit of it again, or at least to make the estate apply it to the payment of another debt than the one to which it was to be and had been applied:

II. The defendant assigns for error the action of the court in allowing to be read as evidence certain entries from the book of Armstrong, and in not excluding the same on motion. At the time of the trial, Armstrong was dead. The entries referred to were in a " Note Book " or " Register " kept by him. These entries described the four notes of Wooderd to Armstrong, referred to in the statement, and across the three first were written the word " paid," and they were crossed out. Opposite the fourth note for $363.66 (of Wooderd to Armstrong) were the following entries :

" April 11, 1861, paid, ..................... $200 00
April 27, 1861, paid, ..................... 100 00
July 17, 1861, paid, ..................... 100 00
February 26, 1862, paid, .................. 400 00
January 10, 1863, paid, .................... 333 23
February 7, 1863, these notes paid and can-
celed by payment of balance, ............ 70 00 "

These entries likewise described the two Long notes for $319 and $81, and consisted of credits of sundry receipts

of *interest* up to May 21, 1863, followed by the words: "Bo't by W. D. McCash."

There was *no entry of any payment of the principal.*

The State offered the book containing these entries, to establish its theory of the case as given in the statement.

2. **EVI-DENCE: books of deceased person.** The entries were shown to be in Armstrong's handwriting, but the witness did not *know* when they were made, or whether they were made at or near the dates of the transactions entered. The book itself is not before us.

This general subject will be found much discussed and the authorities collated in *The County of Mahaska* v. *Ingalls*, 16 Iowa, 81, 87, and we have a statutory provision upon the subject (Rev., § 3998), but by statute "the rules of evidence in civil cases are applicable also to criminal cases." Rev., § 4805. These entries, it will be perceived, relate both to the Wooderd and Long notes.

If those in relation to the Long notes were offered, as we suppose they were, as evidence to show that inasmuch as there was *no entry* of the payment of the *principal* of these notes, therefore it was legitimate to infer that no such payment had been made, we say if the entries in relation to the Long notes were offered and used for any such purpose, they were incompetent.

The chief ground upon which such entries are admitted as evidence, is that they were hostile to the *interest* of the person making them, and this hostility must be made clearly to appear. Rev., § 3998; *Mahaska Co.* v. *Ingalls, supra*, 81, 90, 96, and authorities cited.

If payment of the Long notes had been made to Armstrong it would have been *for* his interest, and not *against* it, to omit to make the entry. The entries in relation to the Long notes were, therefore, not admissible to show that these notes had never been paid.

In relation to the admission of the entries respecting

Wooderd's own notes, we cannot say in the absence of the book itself that there was error in this respect. These entries showing a payment of these notes seem to be clearly against the interest of Armstrong.

The only doubt we have on this head is, that there was no proof that the entries were "made at or near the time of the transactions" entered. That the entries must be so made seems to be required by the statute (Rev., § 3998), although aside from the statute this is not absolutely necessary, the chief ground of their admission as evidence being that they are against the *interest* of the person making them. 1 Greenl. Ev., § 147; *Mahaska County* v. *Ingalls, supra*, 96, and cases cited. Whether the statute is simply declaratory without being restrictive, or whether it is restrictive of the common law rule, we need not determine, because the book of entries was before the court below, and may have afforded satisfactory evidence on its face that the entries (conceding this to be indispensable to the competency of the evidence) were "made at or near the time of the transactions" entered. The jury

3. —— instruction as to weight. should be told, certainly, if requested (as the court in this case was), that though this testimony is competent, yet, as the right of cross-examination does not exist, it is not highly favored by the law, and the jury are at liberty to give it such weight and value as under the circumstances they think it justly entitled to. 3 Am. Law Reg. (N. S.), 641.

III. It is next claimed that there was error in refusing to allow the defendant to prove by the witness Robinson

4. —— forgery: competency. that he had paid the Long notes. The record recites that "the defendant offers to show by the witness (Robinson) that then (at the time of defendant's interview with Robinson) he had paid the Long notes." This the court refused to allow the defendant to

do. This evidence was clearly competent. The State claimed that the defendant never paid the Long notes. The defendant claimed that he *had* paid them, and received the receipts in question as evidence of such payment.

This was a controverted question on the trial. Other evidence of this character was received, and impeaching testimony introduced to rebut it. It did tend to support the defense to show that in point of fact the defendant had paid the Long notes as stated in the receipts.

And so long as this was a disputed fact, it was error in the court to refuse to receive the proposed evidence. It is stated by the attorney-general in his argument that he is assured by the district attorney that in point of fact the defendant's evidence of payment, which the court rejected, was the defendant's own statements to Robinson that he had paid the notes. But the record is otherwise, and we act upon it as it is.

IV. One Paine gave material evidence for the defendant. On his cross-examination, the State asked him the question: "Were you not a witness in the case of one Simeon Waterman in this court, and were you not in that case successfully impeached?" The defendant's counsel objected to this question, but the objection was overruled by the court, and the witness " declined to answer whether he was impeached." Referring to this circumstance, the defendant asked the instruction: "A witness cannot be impeached by asking him if he were not successfully impeached in some law suit? Nor can you consider the fact that to such a question the witness declined to make answer." The question was improper. How was the witness to answer whether he was *successfully* impeached? If the court had given the instruction, it might have cured the error.

The court charged the jury, in substance, that even if

*5. —— impeaching evidence.*

The State of Iowa v. Wooderd.

the defendant did pay off the Long notes, yet if, to make out and prove a claim against the estate of Armstrong, he altered receipts which he had before received, to evidence payments made on *his own* notes, such alteration would be criminal.

6. CRIMINAL LAW: forgery: intent.

And, consistently with this doctrine, the court *refused* to charge "That there could have been no intention to defraud the estate of Robert Armstrong in using those receipts, if there were really due defendant the sums named therein." This view of the law taken by the court below was correct. [A man cannot be the judge of the justness of his claim; and upon the assumption of its justice, fabricate or forge writings to evidence its existence. No man, and particularly no man's estate, would be safe if any such doctrine as that contended for by the defendant were to prevail.

Because a man justly owes, but unjustly denies his indebtedness to me, shall I therefore be justified in signing his name to an obligation to pay it?

The criminal intent which the law infers from forging an instrument, and using it as evidence of a claim against the person whose name is forged, cannot be negatived by proof that the claim was in reality a just one.] That such is the law is put at rest beyond any doubt, by the case of the *Queen* v. *Hill*, 2 Moody & Cr., 300; *S. C.*, 8 Car. & P., 274 (1838); and see also *Queen* v *Cooke*, 8 Car. & P., 582; 34 Eng. C. L., 535; *Queen* v. *Beard*, Id., 143; *S. C.*, 34 Eng. C. L. R., 329; *Queen* v. *Forbes*, 7 Id., 224; *S. C.*, 32 Eng. C. L., 497 (1835); *Queen* v. *Birkett*, Russ. & Ry. C. C. R., 86 (1805); *Perdue* v. *State*, 2 Humph. (Tenn.), 494 (1841). In *Queen* v. *Wilson*, 1 Den. Cr. Cas., 282 (1847); *S. C.*, 2 Can. & K., 527, A., authorized by B., his master, to fill up a check for a certain amount, and to use it for a certain purpose, filled it up for a greater sum, and collected the money and

retained it for himself; it was holden a forgery; and it was further held that the circumstance, that the prisoner alleging a claim on his master for a greater sum as salary then due, was immaterial if true. And see also *Reg.* v. *Martin*, Ryan & M. C. C., 483; *S. C.*, 7 C. & D., 548; *Reg.* v. *Greach*, 9 C. & P., 499; 37 Eng. C. L., 195; 2 Bish. Cr. Law, § 492. In the case at bar it is not necessary to express any opinion as to the correctness of the first point decided in the *Queen* v. *Wilson*, *supra*, viz., that fraudulently filling up a check for a greater sum than authorized, is forgery. We express no opinion. We cite the case on the other point, the intent to defraud.

All of the material questions presented by the record, are disposed of by the views heretofore expressed. We need not therefore examine the instructions in detail. Judgment reversed and cause remanded for a new trial.

Reversed.